## THE BOARD OF COUNTY COMMISSIONERS OF SHAWNEE COUNTY v. LUTHER M. CARTER.

Carter, defendent in error agreed October 6th, 1855, with Hunter, Superintendent of Public Buildings of Shawnee County, to furnish materials for a Court House at Tecumseh, to be paid for in installments, which agreement was approved on that day by the County Commissioners. In October and November 1855, nineteen bonds were issued to pay these installments, signed by the Probate Judge and County Commissioner, and by the said Superintendent, sealed and delivered to Carter in presence of the Clerk of the Board of Commissioners, purporting to bind Shawnee County and the successors in office of the said signers, to pay said Carter, his representatives, heirs, or assigns, the sums therein named, at certain times, with interest at ten per cent. per annum. The law in force at the time of making these bonds (Laws 55. pp 212 and 213,) provided that when payments upon contracts for the erection of Public buildings, shall be by installments, the Tribunal transacting county business, shall, upon the certificate of the Superintendent of Public Buildings, that a due proportion of the work has been completed according to contract, order a warrant upon the County Treasurer for such amount as may be due, upon the contract, payable out of the building fund or any monies in the Treasurer not otherwise appropriated, as the Tribunal may order.

The Board of Commissioners were elected by the Territorial Legislature, and had power to levy and collect taxes, provide, by erection or otherwise, public buildings, necessary for the county, and had the control of the county effects and were given a limitless discretion and power, limited only in that they could not impose a county tax, exceding the Territorial, levied in the county for Territorial purposes.

*Held* that these bonds differed in substance as well as in form, from the warrants authorized by the Statute.

The county is a political subdivision of the State or Territory acting as a corporation with specific powers, through its officers as agents, whose

duties are not only pointed out by law, but the mode of performing them is laid down with accuracy and precision.

*Held* that when so laid down, there is no discretion in the officers, as to the manner in which they are to act. In that respect they are *ministerial officers*, and bound to observe the limitations imposed upon them by law.

The rule that " when Statutes confer special ministerial authority, the exercise of which may effect the rights of property, or incur a municipal liability, it shall be strictly observed, and a material departure will vitiate the proceedings," recognised as a true one.

The Statute of 1855 prescribed the mode in which the installments should be paid—the only mode known to the law. The Board of Commissioners only, were authorized to create evidences of debt against the county, or to order money to be drawn from the Treasury, and that only by warrants, bearing no interest of themselves, for audited claims alone ; and on these alone was the Treasurer authorized to pay. The manner of creating indebtedness against the county being prescribed by Statute, must be observed.

A warrant *defined* to be an order by which the drawer authorizes one person to pay a particular sum of money.

The effect of such warrants drawn on an empty Treasury, considered ; and the effect of the substitution, by the Board, of bonds bearing a high rate of interest, for the warrants, discussed.

The rule that "if an affirmative Statute direct anything to be done in a certain manner, that thing shall not, even though there are no negative words, be done in any other manner " is a rule established on well considered principles.

This rule applied to this case and *held* that the bonds sued on were void under the law.

The act of 1857 confirms contracts made by the Probate Judge and County Commissioners of Shawnee county for the erection of a Court House, and provides (Sec. 2) that the bonds or other evidences of debt, heretofore issued, by said Probate Judge and County Commissioners, for, or on account of the construction of said Court House, shall be valid and binding.

The Organic Act defines as sharply as most Constitutions, the limits of Legislative power, as existing to all rightful subjects of Legislation, with certain specified limitations ; while *all* the judicial authority is entrusted to the Courts.

No rule can safely be laid down in terms separating legislative from judicial duties. Courts have contented themselves with simply settling the precise case before them. A strong and increasing disposition, on the part of the judiciary to restrain the legislature from the invasion of private rights, to which the haste of law-making operations often tends, recognized.

*Semble* that it would be competent for a legislature to furnish new and more efficacious remedies or to create a more beneficial interest or tenure, or, by supplying defects or curing informalities in the proceedings of Courts or of public officers acting within the scope of their authority, to give effect

to acts to which there was the express or implied assent of the parties interested.

Rule No. 2 of Sedgewick "that a Statute which dispenses, in favor of some particular individual, with the general rules governing similar cases, does not come within the rightful attributes of legislative power and is not to be regarded as law," recognized and applied to the act of 1857.

*Held* that the County Commissioners were not acting within the scope of their authority in issuing these bonds, and that their acts therein were void, not for any want of formality or regularity, or mistake, but for want of power under the law, and *held* that the act of 1857, differing in this, from those retrospective laws supplying defects and curing informalities in the proceedings of officers and tribunals ; and retrospectively dispensing, in favor of a particular individual, with the general rules governing similar cases, to the injury of other parties, and in imposing burdens contrary to previously established law, and changing and effecting rights, so far as it pretended to effect these bonds, is void,

The facts of the case appear at length in the opinion of the Court.

The case was argued by *J. & D. Brockway* for plaintiffs in error, and by *Wilson Shannon* for defendant in error.

*J. & D. Brockway*, for plaintiff in error.

I.   The bonds upon which suit was brought in the District Court, are void.   They were issued without authority of law, and in contravention of an express provision of statute.   These bonds were issued by the Board of County Commissioners of the County of Shawnee to the defendant in error in payment for the construction of a court house at the town of Tecumseh.   It was in evidence on the trial in the Court below, that the bonds were issued in pursuance of a written contract made with Carter, by the terms of which he was to be paid in ten per cent. bonds, in installments, as the work progressed.   This contract as well as the bonds executed under it, was in violation of a law of the territory then in full force, regulating the payment of debts incurred by counties in the erection of public buildings.   By the 6th Section of the County Buildings Act, (*Laws of* 1855, *pp.* 212-213,) it is provided that when

payments upon contracts for the erection of public build-
ings, shall be by installments,—the tribunal transacting
county business, shall upon the certificate of the Superin-
tendent of Public Buildings, that a due proportion of the
work has been completed and executed according to con-
tract, order a warrant upon the County Treasurer for such
amount as may be due upon the contract, payable out of
the building fund, or of any money in the treasury not
otherwise appropriated, as the tribunal may order.

This statute prescribed the mode in which the install-
ments should be paid,—the only method known to the law.
The Board of Commissioners, *only*, were authorized to
order moneys to be drawn from the treasury, and they
could do it only by a *warrant* on the County Treasurer.
It will not be contended that these bonds are warrants.
A warrant is an order by which the drawer authorizes one
person to pay to another a particular sum of money. But
these instruments cannot by any legal or reasonable con-
struction be said to be orders on the County Treasurer.
They are not orders or warrants in any sense whatever.
They are simply ten per cent. bonds, payable at a future
day. They differ from warrants in substance as well as
form. A warrant would not entitle the holder to claim
interest on it till after presentment for payment, and then
only at the rate of six per cent. These bonds bear inter-
est from date at ten per cent. per annum. They are not
directed to the County Treasurer, and he could have no
legal authority to pay them on presentation. He was only
authorized to pay money out of the treasury upon the pre-
sentation of warrants ordered by the tribunal transacting
county business. (*See Laws of* '55, *pp.* 213-214.) The
statute, by implication, prohibited the issuing of bonds by
the Board of Commissioners. Their authority to bind the
county was restricted to the exercise of the powers con-
ferred upon them by law. It seems to be a well settled
rule of law that when the duties of an officer are defined,

and the mode of performing them prescribed by law, that the power must be exercised precisely as it is given. Indeed it is said to be a maxim " that if an affirmative statute direct a thing to be done in a certain manner, that thing shall not, even although there are no negative words, be done in any other manner." *Hull & Argalls* v. *the Co. of Marshall*, 12 *Iowa*, 142-158.

When an agent whose powers are limited by statute, or whose authority is special, *exceeds* his authority, his acts do not bind his principal. 12 *Iowa*, 142 ; 16 *How. Prac.*, 432 ; *Delafield* v. *the State of Ill.*, 26 *Wend.*, 192 ; *Schimmelpennick* v. *Bayard*, 1 *Pet.*, 264 ; *Story on Agency*, 160, *Sec.* 170 ; *Beals* v. *Allen*, 18 *Johns.*, 363 ; *Dunning* v. *Smith*, 3 *Johns. Chan*, 344 ; 14 *Mass.*, 58 ; 8 *Mass.*, 292 ; 1 *Pick.*, 215 ; 19 *id.* 511 ; *Farmers Loan and Trust Company* v. *Carroll*, 5 *Barb.*, 649 ; *Angell & Ames on Corporations*, 327.

II. The Act of the Territorial Legislature, approved Feb. 17th, 1857, (*Laws of* 1857, *p.* 50,) undertaking to legalize these bonds by declaring them valid contracts, exceeds the just limits of legislation, is retro-active, unconstitutional and void.

Section 24 of the Organic Act, contains the following provision : " The legislative power of the territory shall extend to all *rightful* subjects of legislation consistent with the Constitution of the United States, and the provisions of this act."

Now this law is an Act *declaring* these bonds valid ; that is, they were, in the opinion of the Legislature, *valid*, from and after the 17th day of February, 1857. But this right to pass upon the validity of contracts and written instruments belonged to the judiciary. To declare an instrument for the payment of money *valid* or *void* is a *judicial act*, and the 27th section of the Organic Act vested the judicial power in the *courts* of the *territory*, and thus prohibited its exercise by the Legislature.

The Constitution of the United States has forbidden the passage of any law impairing the obligation of contracts. *See* 10th *Section of* 1st *Art. of the Constitution U. S.*

If these bonds had been valid in their inception, and an act of the Legislature, undertaking to increase or diminish the liability of the plaintiff in error had been passed, can there be any doubt that such an act would have been within this constitutional prohibition? Does the constitution prohibit the Legislature from passing laws *impairing* the obligation of contracts and yet permit it to pass laws *creating* the obligation, or to *make* contracts themselves. It might with more reason be contended that the Legislature has power to *revive* a claim barred by the statute of limitation, but it has been held that this cannot be done. 11 *Mass.*, 400.

The exercise of such a power would be quite as despotic, odious and oppressive, as the *impairing* of the obligation of a contract *could* be, while it would come fully within the spirit, if not the letter of the constitutional prohibition.

If the Legislature could *enact* validity into these instruments, *void for want of authority to make them,* then it could have exercised the same power over them if they had been forgeries, and void on that account. The plaintiff in error had a perfect and complete defense to these bonds or to any action Carter or his assigns could have brought on them, on the 16th of February, 1857. Could the Territorial Legislature legislate it away on the 17th? If so what does that clause of the Federal Constitution mean which declares that "no person shall be deprived of life, liberty or property without due process of law?" This most salutary restriction cannot mean that no person shall be deprived of life, liberty or property without due process of law, *unless* the Legislature shall see fit to pass a statute for that purpose. *See Taylor* v. *Porter,* 4 *Hill,* 143-4-5-6.

These parties were entitled to a judicial determination of their rights by the application of the established rules of law, each party having an opportunity to be heard. But the Legislature undertook to make a law for the case, affecting, divesting and changing rights, so that the Act if valid has all the effect of a judgment; though in violation of all the principles upon which judgments are rendered.

The Act is in no way remedial, or to cure any formal defect, but intended to legalize acts done in contravention of a plain statute of which all parties had notice, and no equity can be set up by a party to a transaction, wholly without authority of law. "It is by the law in its due and orderly administration, through appropriate tribunals, and not by force of an act of legislation only, that the subject can be deprived of his property." *Denny* v. *Mattoon, et al.* 2 *Allen*, (*Mass.*) 361; *Taylor* v. *Porter*, 4 *Hill*, 140; *Wynehammer* v. *the People*, 3 *Kernan*, 390; *Dash* v. *Van Kluck*, 7 *Johns.*, 477; *Powers & Wyckoff* v. *Bergen*, 2 *Sel.* 358-366-367; 11 *How. Prac.*, 289; *Holden* v. *James*, 11 *Mass.*, 400; 16 *id.* 215; *Good* v. *Tercher*, 12 *Ohio*, 364; 1 *Boy.*, 252; *Greenough* v. *Greenough*, 11 *Penn. State*, 489; *Greenfield* v. *Dorris*, 1 *Snud.* (*Tenn.*) 548; 5 *id.* 186; 25 *Mo.*, 291; 26 *id.* 175.

*Wilson Shannon*, for defendants in error.

The 1st Section of the Act of 1855, page 212, provides that a court house shall be built upon such plan and such material as shall be presented by the tribunal transacting county business, &c., under the control and supervision of a commissioner of the county as superintendent of public buildings. The 6th Section of the same Act page 213, requires the tribunal transacting county business to order a warrant for such amount as may be due. By the 28 and 29 Sections of the Act of 1855, page 231, there is established a tribunal transacting county business, called the Board of Commissioners for the County, and the Probate

Judge is made the president of the Board of Commissioners. Two commissioners are required to be elected, who with the Probate Judge constitute the tribunal transacting county business, and two constitute a quorum to do business. *Sec.* 36, *p.* 232, *Act of* 1855. The 31st and 32d Sections of Act of 1855, page 231, gives to the tribunal certain powers, and among other things provides that the commissioners shall provide ways and means for the erection of public buildings, &c. They shall cause to be erected or otherwise procure for the several counties suitable court houses, jails, clerks offices, and other public buildings deemed necessary. From these provisions of the Statute it will be seen that the County Board are not only authorized, but they are required to erect or provide a suitable court house. It was under the authority of these statute provisions that the County Board entered into the contract with L. M. Carter, for the erection of a court house in Shawnee County, and Carter in good faith went on and performed justly his contract, and the Board gave him the bonds in suit, as evidence of the indebtedness of the county to him. It is claimed that these bonds are not binding on the county, because the Board were not authorized to issue bonds as evidence of indebtedness, but were required to issue warrants, and because they did not issue warrants instead of bonds the county refuses to pay anything. That the Board had the right and authority to make this contract to erect a court house, is not disputed. That the defendant in error went on and performed his contract and did the work for the county that he agreed to do, and the same was accepted by the Board, is not contradicted. It is not denied but the county is bound to pay the defendant in error the contract price for building the court house, but it is claimed the plaintiff below cannot sue on these bonds. To do away with all doubt on this subject, the Legislature of Kansas on the 17th of February, A. D. 1857, (page 50-51, Act of 1857),

Commissioners of Shawnee County v. Carter.

passed an Act declaring that all contracts and agreements heretofore made by and with the Probate Judge and County Commissioners of Shawnee County for the erection of a court house in the town of Tecumseh, in said county, are hereby approved and affirmed.

The 2d Section provides that the bonds or other evidence of indebtedness heretofore issued by said Probate Judge and County Commissioners for or on account of the construction of said court house, are hereby declared valid, binding upon said county, and the said Probate Judge, and County Commissioners, are hereby authorized and empowered to receive any such bonds as evidence of indebtedness from time to time, or to issue others in such manner and such terms as they may deem necessary or advisable, to be applied in payment for building, finishing or furnishing said court house, or for a county jail to be hereafter erected. This Act cures all defects if there are any in these bonds, and if this Act is a valid Act and the Legislature had the right to pass it, then there is an end to this case. The authorities on this point both State and Federal, are very clear and full to the point, that the Legislature has the power to pass such a curative act. This Act of 1857, does not impair the obligation of any contract, but on the contrary, makes valid a contract which is claimed at last to be invalid. Carter has an equitable right to the money named in these bonds; the Act of '57, joins the legal to the equitable right, and makes the legal as well as the equitable right of the plaintiff below to the money in the bonds perfect. This the Legislature had an undoubted right to do, and in support of this position I will refer to the following authorities, as conclusive.

*Smith's Com.*, *p.* 409, *Sec.* 267-8-9; *Sedg. on Statutory and Constitutional Construction*, *p.* 198; 3 *Dall.*, 386-391; 16 *Barb.*, *S. C. R.*, 188; 8 *Mass. R.*, 468; 10 *Sarg. & Rawle*, 101-97; 9 *Mass. R.*, 157-360; 16 *Sarg. & Rawle*, 31; 21 *Pick.*, 542; 7 *Watts*, 300; 16 *Ohio*, 599.

The Federal courts are equally clear on the same point. *Watson* v. *Mercer*, 8 *Pet.*, 88; *Leland* v. *Wilkinson*, 2 *id.* 627; *Saterlee* v. *Mathewson*, 2 *id.* 407.

The above authorities clearly establish the position that the Legislature have the right to pass a retrospective law, if it does not impair the obligation of a contract. It will not be claimed that the law of 1857 impaired the obligation of any contract. But I claim that issuing these bonds instead of warrants on the Treasurer, was a substantial compliance with the Statute. The warrants are evidence of debt, and so are the bonds. They are substantially the same thing, and issuing the bonds by the county is a substantial compliance with the Statute.

From the Sections of the Statute above referred to, it will be perceived that the County Board had not only the power, but it is made their positive duty, to erect or provide a court house, &c., for the county. It being the duty of the Board to provide a court house by erection or otherwise, there is an implied power that the Board may erect or provide a court house on the credit of the county. Where power is granted to public officers to do a particular thing, and especially where the law requires them to do that particular thing, they have the implied power to use the ordinary means to do what the law requires them to do. To pledge the credit of the county for the erection of the court house, is an ordinary means, and the usual means, and indeed the only means the Board had at the time for the erection of the court house. If the Board had the power to pledge the credit of the county for this purpose, it follows that they had the power to give the evidence of indebtedness, and it matters not whether this evidence of indebtedness was in the shape of warrants or bonds, or a simple acknowledgment of indebtedness. A corporation (and Shawnee County is a municipal corporation,) although not specially authorized to contract in that form, may make a promissory note for a debt in the course

of its legitimate business. 2 *Hill Rep.*, 267; *Mott* v. *Hicks*, 1 *Cow.*, 513; 3 *Wend.*, 94.

The power of a corporation to borrow money extends to all cases where it is essential to the transaction of its ordinary business, but not beyond that, as it is an incidental, not a principal power. *Burr* v. *Phœnix Glass Co.*, 14 *Barb. Rep.*, 358.

A corporation has incidental authority when not specially restricted, to borrow money for any of its lawful purposes. 25 *Barb. Rep.* 146; *See also* 1 *Sandf. Ch. Rep.*, 280; 24 *Barb Rep.*, 20.

Corporations that have the power to borrow money, have also the power to give obligations for its repayment in any form not expressly prohibited by law. 15 *N. Y.*, (1 *Smith*) 9.

In the Court below it was claimed that the plaintiff should have proved that the persons who signed these bonds had been duly commissioned and qualified.

It was proved that at the time and long before the bonds and contract for the court house were made, the officers signing them acted for the County of Shawnee in the capacity in which they signed the bonds and contract. In other words we proved they were *defacto* officers of Shawnee County. Acting, and general reputation are competent evidence to prove official character. *Johnson* v. *Steadman*, 3 *Ohio R.*, 94; *Eldred* v. *Seaton*, 5 *Ohio Rep.*, 215.

The official acts of officers *defacto*, and not *de jure*, are valid and cannot be impeached either directly or indirectly. The officers may be ousted but their acts are valid. *The State* v. *Jacobs*, 17 *Ohio Rep.*, 143; *The State* v. *Allen*, 12 *id.* 16; *The State* v. *Constable*, 7 *id. p't* 1st, *p.* 7.

*By the Court*, KINGMAN, J.

On the 23d day of January, 1860, Luther M. Carter, the defendant in error, instituted suit in Shawnee County against the plaintiffs in error, on nineteen separate bonds amounting in the aggregate to $2,913, of which bonds

amounting to $171.00 were dated the 6th day of October, 1856, and bonds amounting to $1,071.00 were dated the 27th day of November, 1856.

These bonds were each signed by William O. Yager, Probate Judge, E. Hoogland, County Commissioner, and Duke W. Hunter, Superintendent of Public Buildings, and sealed and delivered in presence of the Clerk of the Board of Commissioners of Shawnee County, and although made payable at different times, each bears interest from date at the rate of ten per cent. per annum.

These bonds professed to bind the County of Shawnee for their payment. They were given in fulfillment of an agreement made on the 6th day of October, 1855, between the defendant in error, and Duke W. Hunter, Superintendent of Public Buildings for Shawnee County, for furnishing materials and finishing the Court House in Tecumseh, (brick work, lathing and plastering and painting excepted,) which agreement was approved by the Board on the same day, and made the payment for the work, payable by installments.

The suit was transferred by change of venue from Shawnee County, to Douglass, and on the 8th day of May, A. D. 1862, a trial was had, which resulted in a verdict and judgment for the defendant in error, against the plaintiff in error, for the sum of $4,657.05 and the costs of suit.

Various questions were raised upon the pleadings, and in the course of the trial, which were not argued by the counsel and will not be considered by the Court, as the conclusion we have reached on the main point and the one which was presented in the argument renders an examination of the others unnecessary.

The important question to be settled, is one raised on the instructions of the Court to the jury, and is in fact, whether the county of Shawnee is liable on these bonds. And the consideration of this question involves the examination of principles of great difficulty and delicacy.

After the bonds were issued, to-wit: on the 17th day of January, 1857, the Legislature of the Territory passed an act approving and confirming these bonds and declaring them valid and binding upon the county. *Laws* 1857, *page* 50.

In settling the question whether the county is liable on these bonds, it will be necessary to examine first whether they were valid in their inception and execution by the law then existing? If they were the whole case is disposed of, if not then it remains to see what is the effect of the act of 1857.

The first inquiry then is as to the law in force when the contract was made and the bonds sued on were executed.

The general financial affairs of the county were entrusted to a Board of Commissioners with power to levy and collect taxes, build bridges, and open and keep in repair roads and highways and provide by erection or otherwise public buildings necessary for the county, and have the control and management of the property and effects of the county.

These commissioners were elected by the Territorial Legislature and their powers were very extensive, and with no check upon the indiscreet and ruinous exercise of those powers, save in the limitation prescribed as to the extent of the tax which they might levy. Not receiving their position from the people, they were not responsible to them, nor were they accountable to any other tribunal for the exercise of their discretion. The use or abuse of their power had but one check, they could not impose a tax exceeding the amount of Territorial taxes levied in each county for Territorial purposes.

As long as they confined themselves within the limits of the law, they were not responsible for the discretion with which they exercised that power. It was within the scope of their authority to contract for the erection of county buildings greatly larger and more costly than the wants of

the community would justify, and impose a debt upon the county for the payment therefor, which would be onerous and oppressive, and yet the Courts had no authority to interfere. It is not our duty nor within our province to inquire whether the Court House in Tecumseh was required by the wants of the people, nor whether the burthen imposed upon the county by its erection was onerous or not, ours is the much more limited duty of ascertaining whether that burthen was imposed by competent authority in the manner prescribed by law.

The county is a political subdivision of the State acting as a corporation with certain specified powers, and acting through its officers in a certain prescribed way pointed out by law. These officers are the agents of the county, acting for it in all those matters confided to them by law, each in his appropriate and prescribed line of duties—and many, if not most of the duties entrusted to them are not only pointed out by the law, but the very mode of performing them is laid down with accuracy and precision. When so laid down there is no discretion in the officers as to the manner in which they are to act. In that respect they are ministerial officers and bound to observe the limitations imposed upon them by the law, agents who can not act in any but the prescribed way, and this rule loses nothing of its force when we remember that these agents were at the time these bonds were executed, not agents created by the principle that was to be bound, but by the Territory through its Legislature.

" It is a general rule," says the Supreme Court of Iowa, " that when the Statutes confer the special ministerial authority, the exercise of which may effect the rights of " property, or incur a municipal liability it shall be strictly " observed and that any material departure will vitiate the " proceedings." 12 *Iowa*, 153.

And to this effect is the general tenor of the authorities cited by counsel for plaintiff in error. While the Board

of County Commissioners had great power and almost limitless discretion in plunging the county in debt, yet the manner in which this could be done, being prescribed by the Statute, must be observed.

The law then in force, provided [*pages* 212 213, *Stat.*, 1855] that when payments upon contracts for the erection of public buildings shall be by installments, the tribunal transacting county business, shall upon the certificate of the Superintendent of public buildings that a due proprotion of the work has been completed and executed according to contract, order a warrant upon the County Treasurer for such amount as may be due upon the contract, payable out of the building fund, or any money in the Treasury not otherwise appropriated, as the tribunal may order.

This Statute prescribed the mode in which the.installments should be paid; the only mode known to the law. The Board of Commissioners only were authorized to order money to be drawn from the treasury, and they could do it only by a warrant on the County Treasurer. They had no power to bind the county by bonds, and herein was the only safe guard which the Legislature had left the people against oppressive burthens which might in the end ruin them with excessive taxation.  When there was no money in the treasury to pay the warrants, if extravagant and speculative outlays for buildings were attempted, the measure would defeat itself because the warrants would be of so little value that cupidity itself would fail of a desirable object of investment in becoming the owner of such warrants.  They would be so discredited as to become valueless in market, and the temptation to involve the county removed.  The accumulation of debt would cease from the inability of the county officers to carry on projected improvements on a credit.  Poor as was this barrier against extravagant or visionary contracts, it is one which would be likely in a new country to arrest the evil before it had reached the point of ruin, and the anxiety to ad-

17

vance local interests at the general expense would receive a check for the want of means. If, however, the Board could substitute for warrants, bonds bearing a high rate of interest, it would furnish an investment that might tempt men to take contracts for the erection of such buildings for the county as might suit the Board, at ruinous prices, and rely upon making up for the present want of availa- bility, by the high prices and high rate of interest ob- tained in the end. For if the Board, by the substitution of bonds for warrants, could stipulate for ten per cent. on the same principle, they might make it fifty, and thus in- duce contractors to take the risk of the debt being indefi- nitely postponed on account of the corresponding benefits that might be realized.

These bonds were not in any sense warrants. A war- rant is an order by which the drawer authorizes one person to pay a particular sum of money. The Board alone were authorized to draw these warrants on the treasury, and that for audited claims only. They bore no interest of themselves, and on these warrants alone was the County Treasurer authorized to pay any money. By warrants alone were the Board authorized to create evidences of indebtedness. The bonds differed in substance as well as in form from warrants. They bore interest from date. They bore a higher rate of interest than the law allowed on warrants even after presentation. They were not drawn on the Treasurer, did not authorize him to pay out any money, and in no respect do they conform to the provi- sions of the law for evidencing the indebtedness of the county. In these, and perhaps other respects, the bonds differed from the only mode authorized by law for binding the county, and upon well settled principles were therefore void.

Dwarris in his treatise on Statutes, lays down this rule: "As a maxim it is generally true that if an affirmative Statute direct a thing to be done in a certain manner,

that thing shall not even though there are no negative words be done in any other manner," and this rule appears to be established on well considered principles, supported by a long train of authorities. Applying this rule to the case before us, and it will leave no doubt that the bonds in their creation were void. They might as well have been executed by the Sheriff and Treasurer as by the Board. The former officers had as much authority to execute them as the latter, and they would have been as valid in one case as in the other.

It remains to examine what was the effect of the act of the Legislature of 1857. The first section simply ratifies and confirms all contracts theretofore made by the Probate Judge and County Commissioners of Shawnee County for the erection of a Court House, and has nothing to do with this case, as the contract in this case was made with the Superintendent of Public Buildings.

The second section declares that "the bonds or other evidences of indebtedness heretofore issued by said Probate Judge and County Commissioners for, or on account of the construction of said Court House, are hereby declared valid and binding."

It is urged on the one side that this act is clearly and fairly within the scope of the legislative power, and makes the bonds binding on the county, and on the other side, that it is a usurpation on the part of the Legislature of judicial authority, and therefore as void as the bonds themselves.

This presents a question which has much embarrassed Courts.

The Organic Act defines as sharply, as is done by most of the State Constitutions, the limits of legislative power as extending to all rightful subjects of legislation, with certain specified limitation, while all the judicial authority is entrusted to the Courts.

While it is clear enough that under the Organic Act, as well as in most State Constitutions, the distribution of

power among the different branches of government seems plain and obvious, yet there is still the great difficulty of ascertaining exactly what is a rightful exercise of legislative power.

Ch. J. Marshall said (6 *Cranch*, 136,) "How *far* the power of giving the law may involve every other power, in cases where the Constitution is silent, never has been, and perhaps never can be definitely stated."

And Comstock, J., in delivering the opinion of the Court of Appeals in the case of Wynehamer v. The People, 3d Kernan, 392, in speaking on this subject, says: "I am reluctant to enter on this field of inquiry, satisfied as I am that no rule can be laid down in terms which may not contain the germ of great mischief."

Similar expressions are to be found in almost every decision where the question has been raised, and Courts have contented themselves with settling the precise case before them, rather than to lay down any general rule.

It will not therefore be considered as claiming too much modesty in this Court, if it shrink from attempting to lay down the line which separates legislative from judical duties and functions. It cannot be doubted that there are many cases in which the Legislature may with propriety exercise powers which partake of a judicial character, as when they "furnish new and more efficacious remedies, or create a more beneficial interest or tenure, or by supplying defects or curing informalities in the proceedings of courts or of public officers, acting within the scope of their authority; they give effect to acts to which there was the express or implied assent of the parties interested."

Such acts it seems from all the authorities it is competent for the Legislature to do, and there are many cases when such legislation would not only be valid but would operate with a most beneficial and salutary effect. And the courts in some of the States have gone great lengths in sustaining such legislation. The learned counsel for

the defendant in error has cited a large class of cases of this character, but none we think that go so far as this Court is invoked to do in this case.

Those of the Supreme Court of Massachusetts, which go as far or farther than any in this matter, are not reasoned by the very able Court which rendered them, and the decisions were only reached by a divided Court, and the principles on which they were founded are questioned in later decisions. In Denny *v.* Mattoon, 2d Allen, 385, the Court says : "when necessary it may be proper to reconsider them with care." The principle of the decision just cited, may be referred to as authority directly sustaining the conclusion we have arrived at in this case.

All the cases cited from the Federal Courts having any bearing on this case, are expressly decided on the ground that they do not conflict with the provisions of the Constitution of the United States, and the question we are examining is excluded from their consideration. We do not propose to comment at length upon the authorities.

Mr. Sedgwick in his treatise, after examining the various decisions, deduces from them as guides to some extent, certain rules of which the second is as follows :

"That a statute which dispenses in favor of some particular individual, with the general rules governing similar cases, does not come within the rightful attributes of legislative power, and is not to be regarded as a law." Page 177.

We have examined with much care and diligence such authorities as were accessible to us, and think this rule is fairly deduced from them, although great contrariety is observable. In some cases which seem to be the best considered and best sustained by reason, the strict division of the powers of government has been enforced, and as the subject is more discussed and better understood, it is as the author just cited remarks, obvious that there is a strong and increasing disposition on the part of the judiciary to restrain the Legislature from the invasion of pri-

vate rights to which the haste of our law-making opera-
tions frequently tends. Apply the rule above quoted to
the case before us, and it is apparent that the Act of 1857
cannot be regarded as a law, for it retroactively disposes
in favor of a particular individual, with the general rules
governing similar cases, to the manifest injury of other
parties. The county could not by any implication be held
to have consented to the increased burthen. She had no
officers authorized to signify such assent. The Legislature
assumed to decide without the parties being before it.

The act differs from those retrospective laws which are
frequently passed supplying defects and curing informali-
ties in the proceedings of officers and tribunals acting
within the scope of their authority. The County Com-
missioners were not acting within the scope of their au-
thority in issuing these bonds. They did not conform to
the law *only* in an irregular way, but they broke down the
barriers which the law had raised in a very regular way,
and their acts in the premises were void, not for want of
any formality or regularity or mistake as to time or other-
wise, but for want of power under the law.

The defendant had his rights. The law pointed them
out. He was entitled (if to any thing,) to his warrants,
and must bide his time for their payment under the limited
power of taxation conferred on the Board. He preferred
bonds with a higher rate of interest, trusting to the heal-
ing power of subsequent legislation. He had as much
right and power to bind the county in the execution of
these bonds as the Board had. If he had made these
bonds, the Legislature would have had as much power to
make them valid by an act declaring them binding upon
the county as it had in the present case. Let such a power
be once recognized, and within what bounds will the exer-
cise of it be limited? The Legislature undertook to make
a law for this case, affecting and changing rights and im-
posing burthens contrary to previously established law, so

that the act if valid has all the force of a judgment though in violation of the principles upon which judgments are rendered. If the act is a law there is no evading it, even could it be proven that none of the work had been done, or that it had been previously paid for, or that the contract had been procured by fraudulent collusion between the officers making it and the contractor. Courts are estopped from an inquiry into the facts by the act itself, if it have any force in this case. We cite these results from the act, not as having any existence in this case, but to show the consequences which would result from upholding the power of a Legislature to exercise such authority.

We think, therefore, that the act so far as it pretended to affect these bonds, is void, and the instruction of the Court below being otherwise, was erroneous.

The judgment of the District Court is reversed, and the case remanded for a new trial.

All the justices concurring.