# City of Williamsport *versus* Commonwealth *ex rel.* Bair and Shenk.

|   |   |
|---|---|
| 84  487 |
| 190  443 |
| 84 | 487 |
| 21 SC | ¹240 |
| 84 | 487 |
| 27 SC | 5 |
| 84 | 487 |
| 31 SC | ¹475 |

1. The ordinance of the city of Williamsport of June 22d 1868, so far as the same provides for grading and paving its streets is valid, and the improvements made by the city, and the bonds issued in pursuance thereof, were within the powers of the municipality.

2. Where a municipality has lawfully created a debt, it has the implied power, unless restrained by its charter or a statute, to evidence the same by bill, bond, note or other instrument. The power to contract the debt implies the right to issue the proper acknowledgment therefor.

3. Where a municipal corporation undertakes that which does not necessarily appertain to the municipality, it must have express power to do so, but the power is implied where it undertakes to do that which is necessary for it.

4. The Act of March 21st 1867 does not limit the implied authority of the city of Williamsport to issue bonds for municipal improvements. The limitation to borrow money is not a limitation of the power of the city to perform a necessary municipal duty.

5. AGNEW, C. J., and WOODWARD and STERRETT, JJ., dissent.

June 15th 1877.   Before AGNEW, C. J., SHARSWOOD, MERCUR, GORDON, PAXSON, WOODWARD and STERRETT, JJ.

Error to the Court of Common Pleas of *Columbia county:* Of May Term 1877, No. 227.

This was a proceeding for a mandamus commenced in the Court of Common Pleas of Lycoming county, and the venue changed to the Court of Common Pleas of Columbia county. The petition sets forth an ordinance of select and common council of the city of Williamsport of the dates of the 18th and 22d days of June 1868. This ordinance, after reciting that Peter Herdic proposes to advance money to pay off the present indebtedness of Williamsport for improvements of streets and alleys, and to receive bonds therefor, ordains that the proposition be accepted, and that the work be done under the direction of the city surveyor; that the city treasurer and finance committee shall ascertain and report the present indebtedness of the city; that proposals for the Nicholson pavement shall be invited by advertisement; that bonds shall be issued, denominated first bonds of the city of Williamsport, and signed by the mayor and treasurer; that any other person who may advance money to make improvements may receive bonds therefor. On September 22d 1868 an ordinance was passed exempting the bonds from city or municipal taxation, and reciting the form of the bonds. Each bond contains a recital that it was issued in pursuance of "an ordinance to provide for the payment of the present indebtedness of the city and to pave certain streets, &c." This indebtedness is averred to have been, prior to March 26th 1867, $300,000. The petition then avers that 645 bonds of $1000 each, with coupons attached, were issued by said city and were designated "series A, first bonds of the city of Williamsport," and that the petitioners became the holders, for value, without notice, of five of said bonds, and also of coupons; that the coupons were duly presented for payment and

were not paid. It then recites the Act of the General Assembly, entitled " An Act to incorporate the city of Williamsport," approved March 22d 1870, which in substance requires. the city council to assess and levy a tax sufficient to defray the expenses of the city and the interest on the bonds, and also to provide a sinking fund, and limits the tax to 4 per cent.

It sets forth section 20 of an act entitled " An Act dividing the cities of this state into three classes, regulating the passage of ordinances, &c.," approved 23d day of May 1874. This act authorizes cities of the third class to enact ordinances, to make provision for a sinking fund to pay at maturity the bonded indebtedness of the city, and to levy and collect taxes on the taxable property to pay the same.

It then avers that the city of Williamsport is of the third class and has been governed and controlled under the new constitution; that it was the duty of select and common council, to levy a tax to pay interest; that $56,800 is required to pay said interest accrued on these bonds; that the present value of property is $2,500,000; that an ordinance was passed June 1st 1876, assessing for 1876 a tax of ten mills on the dollar, of one per cent. to pay loans of the city and for the improvements, a tax for the sinking fund, and a tax to pay the interest on the funded· debt; that no provision has been made for the payment of the interest; that $20,417.62 was in the treasury unappropriated.

The return of the defendants avers that the city was incorporated by an Act of the General Assembly, which became a law January 15th 1866, and by a supplement approved March 21st 1867, was authorized to borrow money for city purposes, not to exceed $200,000, and to issue bonds therefor; that on the 18th day of June 1868, the debt of the city was $130,000; that the supplement prohibits the sale of the bonds at a greater discount than two per cent.; that Peter Herdic, being the owner of a large amount of property, was desirous of having streets and side-walks, and obtained the passage of the ordinance set forth in paragraph one of the petition; that he did not advance the necessary money to pay off the indebtedness of the city and did not receive bonds therefor; that Herdic did not furnish sums of money to make the improvements in the streets and alleys, but purchased the right to lay the Nicholson pavement; that he induced the mayor and treasurer to deliver him $192,000 of bonds for work alleged to have been done in pursuance of the first ordinance, $12,000 in pursuance of another ordinance, $85,000 in pursuance of another, $46,000 for laying drains, $6000 for purchase of lot for an engine house, and $18,000 for building engine house—in all $359,000; that Herdic was elected mayor and purchased outstanding indebtedness of the city at a discount of from 15 to 40 per cent. and had issued therefor $162,000 of the bonds; that $22,000 of bonds were issued to H. C. Covell for pavement, $4000 to Heisler & Rathmel for a lot for an engine

[City of Williamsport *v.* Commonwealth.]

house, $14,000 to Mann & Talley for building an engine house, and $6000 to the Williamsport Gas Company; that $46,000 were issued for laying terra cotta pipe and drains not authorized, and $77,000 were issued without any pretence of authority or any consideration; that bonds number 124, 282 and 324 were issued without authority; that from these facts respondents believe petitioners knew these bonds were fraudulently issued; that a majority of the bonds are now held by Herdic; that some are valid and some illegal, and prays that it may be judicially decided which are legal and which are not; that it is not true that all the bonds were issued under the ordinance of September 22d 1878; that the Act of Assembly of March 22d 1870, and May 3d 1874, do not impose upon the city the duty of providing for the payment of any indebtedness exceeding $200,000; that there is the sum of $20,417.62 in the hands of the treasurer; that the city is ready and willing to pay the interest on its legal indebtedness, and denies that it has recognised the validity of the whole issue of bonds. To the return are annexed a summary of the legislation of the city ordinances and a tabular statement of the issues and the history of each bond so far as defendants could trace them. By this appendix opposite each bond is set the name of the person to whom issued and for what purpose; where not known the word *unknown* is written. Of these, 183 were marked as issued to persons *unknown*, and 250 to persons and for purposes *unknown*. The petitioners having filed a replication, proofs were taken before an examiner. The plaintiffs offered the bonds and ordinances and proceedings of council, with the acts of the legislature, and closed, and the defendants proved that certain property was assessed in the name of Peter Herdic in the Fourth, Fifth and Sixth wards of the city of Williamsport. The city treasurer during whose terms of office the bonds were issued, testified that the bonds were not kept in a bound book but were in loose sheets; that a memorandum on the back of each voucher was made, but no regular books were kept. He also testified that the persons to whom the bonds were issued and the purpose for which they issued were as follows:—

| | | | | |
|---|---|---|---|---|
| October 1st 1868, | 40 | bonds issued to | Herdic | on account of pavement. |
| " 17th " | 4 | " " | Heisler & Rathmel | on acc't of real estate. |
| " 28th " | 85 | " " | Herdic | on account of his contract. |
| December 1st " | 81 | " " | " | " " |
| " " " | 12 | " " | " | on what account not remembered. |
| " 7th " | 15 | " " | " | " " " " |
| April 6th 1869, | 5 | " " | Mann & Talley | on account of engine. |
| " 22d " | 15 | " " | Herdic | on what account not remembered. |
| June 18th " | 11 | " " | Covill | on account of Wykoff pavement. |
| " 23d " | 5 | " " | Mann & Talley | on account of engine. |
| " 25th " | 5 | " " | Covill | on account of Wykoff pavement. |
| " 30th " | 6 | " " | " | " " |
| Sept. 3d " | 1 | " " | Guise | " grading. |
| " 8th " | 20 | " " | Herdic | " pavement. |
| " 27th " | 32 | " " | " | " " |
| " 28th " | 1 | " " | Guise | " grading. |

[City of Williamsport *v.* Commonwealth.]

Oct. 1st and 14th, 10 bonds issued to Herdic on what account not remembered.
"    16th    1869, 4    "    "    Mann & Talley on account of engine.
"    21st    "    20    "    "    Herdic on what account not remembered.
November 2d  "    9    "    "    "    "    "    "
December 2d  "    2    "    "    Andress on account of culvert.
January 15th 1870, 1 "    "    Guise    "    grading.
February 21st "    2 "    "    "    "    "
May 20th    "    5 "    "    Herdic on account of engine house.
August 6th    "    6 "    "    "    "    "
May 13th    1871, 7 "    "    "    "    "
October 25th 1869 to August 20th 1870, 162 bonds issued to Herdic on account
of old indebtedness.

In his summary in regard to the above issues he testified that

192 bonds were issued for Nicholson pavement on Fourth street.
12    "    "    "    "    "    Market  "
85    "    "    "    "    "    Third  "
22    "    "    "    Wykoff    "    Pine and Williams streets.
18    "    "    "    Mulberry street engine house and lot.
24    "    "    "    West street engine house.
162   "    "    "    old indebtedness.

In addition to the above, 6 bonds were issued for a debt due Williamsport Gas Company, 7 for grading and building culverts, and 46 for terra cotta pipes, drains, &c., and the balance (71) for old city indebtedness.

It appeared also, by the testimony of the treasurer, that he had vouchers for the whole amount of bonds issued for city indebtedness for Nicholson and Wykoff pavements, sewers, drains, grading streets and alleys, building culverts, &c., and that they were handed to the city auditors when they audited his account as treasurer. In their report the treasurer is charged with the proceeds of $645.000 of bonds issued, and credited for payment of city orders, judgments, &c., $305,072.97; for Nicholson pavement, Fourth street, $192,770.49; for pavement on Market street, $12,025.27; for same on same street, $22,411.13; for pavement on Third street, $85.084.56; for Mulberry engine house, $18,000; for West street engine house and lot, $24,368.83; for culverts, $7831.47.

The treasurer also testified that when he produced before the auditors a voucher for the different items the only objection made was as to that for terra cotta pipes, &c., for $46,351.23. The report of the auditors was made to the city councils, accepted and filed.

It appeared that $483,000 of the bonds were issued at par, $140,000 were sold at 63 per cent., $2000 at 67 per cent., and $20,000 at 85 per cent. of their par value.

Interest was paid on the bonds from March 1st 1871 to September 1st 1875. The city surveyor testified that the work was done under his direction, and that he furnished certified estimates to the contractor, who received the bonds on these estimates. While the work was progressing no objection was made by council, and the completed improvements were used by the city.

Plaintiff Shenk testified that he had bought the bonds held by

[City of Williamsport *v.* Commonwealth.]

plaintiff and had no knowledge of any suspicion about them, and that the interest was paid up to March 1876.

The learned judge below entered a decree commanding the defendants to make ample and full provision for the payment of all interest due upon all bonds, by the assessment and collection of such taxes as may be necessary for the purpose.

The entry of this decree was assigned as error.

*Henry W. Watson*, *H. H. Cummin* and *Wayne McVeagh*, for plaintiffs in error.—A municipal corporation has only such powers as are expressly granted, or those necessarily implied or incident to the powers granted, or those necessary to the declared objects of the corporation. Under the Acts of the General Assembly there is no power or authority express or implied in the city of Williamsport to pave its streets. The Act of 1851 gives it the power to lay and drain such roads. &c., as are necessary, and to regulate courts, streets and alleys, and to direct the grading, paving and guttering of the side- and foot-walks. This act does not authorize the paving of streets. To regulate streets does not imply the power to pave. All charters of cities generally expressly give power to pave, and the charters of the leading cities of the state are cited. The city was required to keep the streets in reality as highways. To do this, is distinct and different from paving them. The city of Williamsport had no power express or implied to issue its bonds for the payment of its debts : Dillon's Law of Municipal Bonds 13.

The following cases cited by petitioners below : Mauch Chunk *v.* Shortz, 11 P. F. Smith, 401 ; Fisher *v.* Harrisburg, 2 Grant 291 ; Stroud *v.* Philadelphia, 11 P. F. Smith 255 ; Commonwealth *v.* Pittsburgh, 5 Wright 284, do not touch the point in controversy.

In Police Jury *v.* Britton, 15 Wall. 566, Judge Bradley's conclusions were different from those of Judge Strong in Commonwealth *v.* Pittsburgh, 2 Harris 177 ; Mayor of Nashville *v.* Ray, 19 Wall. 468 ; Commissioners of Shawnee County *v.* Carter, 2 Kansas 115.

If there was an implied power to issue the bonds, it was taken away by the act of the legislature limiting the amount to $200,000. The Act of March 21st 1867, is referred to. Dillon on Mun. Corp. § 416 ; Police Jury *v.* Britton, *supra*.

The issue of bonds has not been ratified. The use of the pavement is not a ratification : Dillon on Mun. Corp., § 386 ; Wilson *v.* School District, 32 N. H. 125 ; Peterson *v.* Mayor of New York, 17 N. Y. 449, 454 ; Bissell *v.* Kankakee, 64 Ill. 249 ; Marsh *v.* Fulton, 10 Wall. 683 ; Mercer County *v.* Pittsburgh and Erie Railroad Co., 3 Casey 404 ; Green's Brice's Ultra Vires 463, 467 ; Martin *v.* Zellerbach, 38 Cal. 300.

There is no ratification by Act of Assembly. The Act of March 22d 1870 does not ratify. If a proceeding be void for want of

authority the legislature cannot validate it : Sedgwick on Statutes 143, note; Hasbrouck v. Milwaukee, 13 Wis. 37. A sale of bonds to a member of council is void : Sherlock v. The Village of Wennetka, 59 Ill. 389; Same v. Same, 68 Id. 160.

Municipal bonds have not the exact qualities of commercial paper : Diamond v. Lawrence County, 1 Wright 353; Thomas v. Commissioners of Allegheny County, 8 Casey 231; County of Armstrong v. Brinton, 11 Wright 367.

Bonds issued without authority are void in the hands of innocent purchasers: Bissell v. Kankakee, *supra ;* Dillon on Mun. Bonds 29–35; Gest v. Pittsburgh, 7 Wright 397.

Mandamus should only issue where a clear and specific right is to be enforced and there is no legal or adequate remedy : High on Ex. Rem., § 9, p. 11.

*Armstrong & Linn* and *Bently & Parker,* for defendants in error.——Where properly elected officers of the city authorized improvements to be made, and passed an ordinance to issue the bonds to pay for the same, the bonds are valid. The ordinance of June 22d 1868, authorized this issue for the payment of the present indebtedness, and the paving of streets. The power to make streets and drains is a necessary incident to the powers of a municipality : Barter v. Commonwealth, 3 P. & W. 253; Philadelphia v. Tryon, 11 Casey 402; Stroud v. Philadelphia, 11 P. F. Smith 255; City of Delphi v. Evans, 36 Ind. 90; Dillon on Mun. Corp., § 544; Grant on Corp. 154; Kyd on Corp. 97.

The city of Williamsport had express power to issue the bonds. The General Borough Law of April 3d 1851, Purd. Dig. (1872) 167, was extended to Williamsport by the Act of April 14th 1852, Pamph. L. (1852) 340 : Fisher v. Harrisburg, 2 Grant 291; Cone v. City of Hartford, 28 Conn. 363; Green v. Borough of Reading, 9 Watts 382; Mayor v. Randolph, 4 W. & S. 514; O'Connor v. Pittsburgh, 6 Harris 187; Sturtevants v. City of Alton, 3 McLean 393. A city may fund its existing debt: City of Galena v. Corwith, 48 Ill. 423.

The Act of March 21st 1867, limits the amount the city of Williamsport *may borrow* to $200,000, but does not limit its power to issue bonds to evidence its indebtedness: Dillon on Municipal Corporations, § 84; Gelpcke v. Dubuque, 1 Wall. (U. S.) 221; Mills v. Gleason, 11 Wis. 470. The city of Williamsport is equitably estopped from denying the validity of the issue of the bonds : Dillon on Municipal Corporations, § 386; Wilson v. School District, 32 N. H. 125; Keithburg v. Frick, 34 Ills. 405. The issue has been ratified: Pennsylvania Railroad Co. v. Philadelphia, 11 Wright 193. Innocent purchasers of municipal bonds hold a good title, the same as the holder of commercial paper : Moran v. Commissioners, 2 Black 722; Zabriskie v. C. C. & C. Railroad Co.,

23 Howard 381; Commissioners v. Aspinwall, 21 Id. 539; Bissell v. Jeffersonville, 24 Id. 287; Grand Chute v. Winegar, 15 Wall. 355, 373; Beloit v. Morgan, 7 Id. 619; Commonwealth v. Commissioners of Allegheny, 1 Wright 285; Reinboth v. Pittsburgh, 5 Wright 278.

Mr. Justice PAXSON delivered the opinion of the court, October 4th 1877.

We are in no doubt as to the validity of the ordinance of the city of Williamsport of the 22d of June 1868, so far as the same provides for the grading and paving of the streets of the city. In fact all of the improvements projected and carried into execution by the city, and for the payment of which a portion of the city bonds were issued, were strictly within its corporate powers. Without express grant such authority is among the implied powers of a municipal corporation: Barter v. The Commonwealth, 3 P. & W. 253; City v. Tryon, 11 Casey 401; Dillon on Municipal Corporations, § 544. The question of the right of a city to file liens against the real estate within its corporate limits for the cost of curbing, paving, building sewers, &c., is not involved in this case, and stands upon a different footing. Nor have we been able to discover any such fraud in connection with the issuing of the bonds as would affect their validity in the hands of original holders. The question whether the defendants in error are innocent holders of the bonds, and if so, to what extent they can be affected by any equities set up by the city, is wholly immaterial.

The real question here is one of power. The contention on the part of the city is that all of its bonds known as series A, issued in excess of the $200,000 authorized by the Act of Assembly of 21st of March 1867, are illegal and void. In other words, that a municipal corporation possesses no inherent power to issue such bonds, and that in the absence of any such power in its charter, or express legislative authorization, the city is not bound thereby. This is a question of grave importance.

The right of corporations to issue commercial paper, or bonds in the nature thereof, that pass by delivery, has been the subject of much discussion by text-writers and of numerous decisions by the legal tribunals of the country. We may here observe that there is a marked distinction in this respect between private and municipal corporations. This distinction has been lost sight of in many of the adjudicated cases, and is perhaps one of the causes of the confusion into which this branch of the law has fallen. As a general proposition the right of private or trading corporations to issue promissory notes, bonds, or other evidences of indebtedness, unless restrained by their charters or the law of the land, may be conceded. The reason is plain. Such corporations are organized for the purposes of trade and business, and the borrowing of money and issuing

[City of Williamsport *v.* Commonwealth.]

of obligations therefor, are not only germane to the objects of their organization, but necessary to carry such objects into effect. Municipal corporations rest upon a different basis. The purposes of their creation are different. The ends sought to be subserved are the comfort, protection and well being of the people embraced within the geographical limits of the municipality. They are clothed with certain powers of sovereignty, limited it is true, but none the less a portion of the sovereignty of the state. Upon the theory that general laws, applicable to the entire state, are often unsuited to the needs of a city, and inadequate to meet its growing wants, and that the local affairs of such communities can be best regulated by those directly interested therein, the state confers upon them a portion of its own sovereignty, retaining a general power of control. The very purpose of the state in creating a municipal corporation is to give it the control of its streets, its police force, its fire department, the arrangements for supplying gas and water, and providing proper sewerage for drainage. These and many others that might be named, are among the legitimate objects of a municipal corporation, expressly recognised by the text writers, and a long line of decisions which it would be an affectation of learning to cite. It is needless to say that a corporation organized for and intrusted with the local government of the people must of necessity possess great and varied powers. As an illustration, the city of Philadelphia, with a population of less than a million, has a revenue from taxation and other sources more than double the entire amount of revenue raised by the state. Her debt is even larger in proportion. She is a great commonwealth within a commonwealth, and her powers for the good of her citizens, in the line of her duty, and within her prescribed orbit, are limited only to obedience to the constitution and laws of the state. Yet her express powers. are not greater than those usually granted to municipal corporations. Her implied powers include all such as are necessary to carry out the objects for which her charter was granted. This is a cardinal rule, not only in regard to municipal corporations, but also those of a private nature. That there may be a difference in even the implied powers of municipal corporations is possible. An implied power springs from necessity. That which may be necessary for a large city, may not be necessary for a small city or borough. That which is not necessary cannot be implied.

Taken in its broad sense, the power to borrow money and issue bonds therefor cannot be said to be among the implied powers of a municipal corporation. For general purposes such power does not exist, for the reason that it is not necessary for the objects for which it was created. Thus it has never been contended, that a municipality may borrow money and issue bonds or notes for objects having no necessary relation to the performance of municipal duties. To admit such a principle would be destructive of such organiza-

[City of Williamsport v. Commonwealth.]

tions, and place the taxpayers of a city at the mercy of the first band of plunderers who should happen to obtain the temporary control of its affairs. The question for our consideration is whether the power to issue bonds is one of the inherent powers of a municipal corporation in a limited sense; that is to say, for the purpose of providing for such expenditure as is strictly germane to the objects for which such corporations are created. We are not without authorities that question, if they do not deny this power. Judge Dillon, one of the ablest writers upon this branch of law, says in his treatise on the Law of Municipal Bonds, at page 13 : " We regard, as alike unsound and dangerous, that a public or municipal corporation possesses the implied power to borrow money for its ordinary purposes, and as incidental to that, the power to issue commercial securities. The cases on this subject are conflicting, but the tendency is towards the view above indicated." The ground principally relied upon by the learned author, and others who take this view of the question, is that the power is a dangerous one. [But showing that the power is dangerous does not prove that it does not exist. Power is always dangerous. Yet it must be lodged somewhere or human governments cease to exist. Without it they can neither repel aggression from without, nor suppress disorder from within. A government without the power to execute its own laws would be contemptible, and of no more stability than a rope of sand. To withhold power merely because of its liability to abuse is Utopian. It is not too much to say that instances of such abuse can as readily be found in the national and state governments as in the humblest municipality. Speaking for myself, I think the remedy for such evils, and perhaps the only one, is to exercise more care in the selection of public officers. When the people elect honest men they will be honestly served; when they elect dishonest men they must expect to be plundered. " All powers may be abused; but are they then to be abridged by those who are to administer them, or denied to have any operation ? If the public frame a constitution the people are to obey it. Neither rulers nor any other functionaries, much less any private persons, have a right to cripple it, because it is according to their own views, inconvenient or dangerous, unwise or impolitic, of narrow limits, or of wide influence :" 2 Story's Com. 386. The dangerous nature of a power might be a pursuasive argument with the legislature why it should be denied to a municipal corporation, but cannot be accepted as a conclusive reason that it does not exist. I am willing to concede that the power to issue municipal bonds is dangerous. It affords opportunities to unscrupulous men, hungering for the spoils of rich municipalities, to enter into extravagant contracts, at ruinous prices, by mortgaging the resources of the people in advance. The facility of placing municipal bonds, at high rates of interest, and having many years to run, is certainly a great inducement in

many cases to unwise and lavish expenditure. It might have been better for the legislature in the first instance to have applied the principle "pay as you go" to such corporations; and to have required them to seek legislative sanction whenever they sought to incur obligations and make expenditures beyond their ability to pay out of their current receipts from taxation. This, however, is a question with which we have no present concern. Our duty is to declare the law, not to make it.

The cases of The Police Jury *v.* Britton, 15 Wall. 566, and the Mayor of Nashville *v.* Ray, 19 Id. 468, were cited as supporting the text in Dillon. In each case the opinion of the court was delivered by Mr. Justice Bradley. The Police Jury *v.* Britton was evidently decided upon its own peculiar facts. The suit was brought against the parish of Tensas, Louisiana, to recover the amount of 460 coupons of $6 for one year's interest on 460 bonds of $100 each. It appeared that in December 1860 and January 1861, the levee inspector of the parish of Tensas issued to certain persons by the name of Kennedy and Maxwell, five "levee warrants" (as they are called) for work done on the levees in Ward No. 3 of said parish, amounting in the aggregate to over $15,000. These warrants seem to have been issued in regular course, according to the law then in force on this subject. Said law was passed in 1848, with amendments passed in 1850 and 1852. It related to the parish of Tensas alone, and the substance of it was, that the police jury of that parish should appoint a levee inspector, whose duty was to superintend and direct the construction and repairs of all levees in the parish in accordance with the requisition of the police jury : to survey the levees, and where work was required, to let it out to the lowest bidder ; and after the work was finished in any particular section the statute directed as follows : "Then the inspector shall issue a warrant, payable to the contractor, which shall be a legal order upon the treasurer of the levee fund for the amount therein specified." The statute then provided for the levee fund as follows : "the police jury are authorized to levy and collect, in the same manner that the state and parish taxes are now collected, an annual tax upon the assessed value of real estate as returned by the assessors of state taxes. Said tax when collected, shall form a special fund for levee purposes alone." Here we have a special statutory provision, designating the form which such indebtedness shall assume, and providing a particular fund for its payment. There is not a word anywhere authorizing the parish jury to issue any bonds, or create any other evidences of debt, for work on the levees. On the contrary, in restraint of the power of police juries and all other municipal bodies of the state to incur expenditures, the legislature in 1853 passed the following act: "The police juries of the several parishes, and the constituted authorities of incorporated towns and cities in this state, shall not hereafter have

[City of Williamsport v. Commonwealth.]

power to contract any debt or pecuniary liability without fully providing in the ordinance creating the debt the means of paying the principal and interest of the debt so contracted." While this act may not have applied to the inspector of levees, acting under the statutes first cited, it certainly affects the rights of the police jury to issue bonds for the amount of the warrants, thus funding a debt which by fair implication of law was payable presently out of the taxes specially levied for that purpose. It is also to be observed that the police jury were merely parish officers invested with powers of administration only as to specific matters. They were charged with the doing of a particular thing in a particular way, and it was well decided that they must obey the requisitions of the statute prescribing their duties. While the opinion of Mr. Justice Bradley goes perhaps somewhat beyond the facts, it is not authority for the broad doctrine that no such implied power exists in any case in municipal corporations. On the contrary, he says: "We do not mean to be understood that it requires in all cases express authority for such bodies (municipal corporations) to issue negotiable paper. The power has been frequently implied from other express powers granted." As an illustration he refers to the implied power of issuing bonds in payment of a subscription to the stock of a railroad company, when such subscription was expressly authorized by the legislature.

In the Mayor v. Ray, *supra*, the judgment of the court was concurred in by a mere majority; the opinion of Mr. Justice Bradley did not receive the sanction of even a majority, and lacks the weight of authority. The facts of the case briefly stated were, that the city officers re-issued the checks of the city drawn by the mayor and recorder upon the treasurer, after the same had been paid. This was done by reason of the embarrassed condition of the city finances and to continue the checks in circulation. It was the mere act of the city officials without the authority of councils. In a suit by A. against the city upon one of these re-issued checks, the court below excluded evidence tending to show fraud and want of consideration and authority to make them in the issue of the notes, and held, that under its charter the city could issue promissory notes, and that if signed by the proper officers and given for a good consideration, they would be legal and obligatory; that a usage to re-issue such securities was good, and that though upon their face overdue, they were payable on demand and not to be deemed dishonored so as to let in defences against a subsequent holder, until the lapse of a reasonable time for making demand. The judgment below was reversed upon a writ of error, Mr. Justice Bradley delivering the judgment of the court, and the opinions of himself and Justices Miller, Davis and Field. Justices Clifford, Swayne and Strong dissented. Justice Hunt concurred in the reversal, for reasons connected with the ques-

3 NORRIS—32

tion of re-issue, and whether the plaintiff below was a bona fide holder. He then said: "In the particulars following, my views are different from those expressed in the opinion of Justice Bradley. I hold it to be well established by the authorities, that a municipal corporation may borrow money for the legitimate use of the corporation and that it may issue its notes for the same, unless expressly prohibited by its charter or by statute from so doing. The proposition that it cannot borrow money unless by its charter expressly authorized to do so is, in my opinion, unsustained by sound authority." The broad question of the implied power of a municipal corporation to issue bonds was not necessary to a decision of the case, and as before stated the opinion of the four judges asserting this principle was dissented from by the other four. What was really decided was, that the court below erred in holding that, though the checks had been presented for payment and payment refused, they were not to be deemed dishonored so as to let in a defence between the corporation and a subsequent holder; that the plaintiff not being a bona fide holder, the court erred in excluding the offer to show fraud, corruption or want of authority to issue the checks; and that it erred in charging that if it was the usage of the corporation to re-issue its securities by sale in the market, after such securities had been fully paid and satisfied, such re-issued securities were obligatory upon the corporation.

The Commissioners of Shawnee County *v.* Carter, 2 Kans. 115, was much relied upon by the plaintiffs in error. Yet when we examine the facts of that case it falls far short of sustaining their position. The commissioners of Shawnee county were authorized by statute to erect a court house at Tecumseh. The act required that warrants should be drawn in favor of the contractor for instalments as they fell due. Instead of doing so the commissioners issued bonds bearing interest at the rate of ten per cent. to the contractors for the instalments. The court held that the bonds could not be issued; that the commissioners were merely authorized to order money to be drawn from the county treasury, and that they could do so only by warrants drawn upon the county treasurer as directed by the statute. We do not question the law of this case. It appears to have been rightly decided. The commissioners were clothed with a limited authority, and the mode of its exercise designated by statute. It was their plain duty to comply strictly with its commands.

In Marcy *v.* Tsp. of Oswego, 2 Otto 637, and Humboldt Tsp. *v.* Long, Id. 642, no question of power was before the court. The contention was whether the bonds in question were negotiable, and whether the holder was bound to look beyond the legislative act authorizing their issue. Nor was such question raised in Commonwealth *ex rel.* Middleton *v.* The Commissioners of Allegheny

County, 1 Wright 237.    There the subscription made by the county commissioners was expressly authorized by an Act of Assembly.

The foregoing are all the cases cited in support of the contention of the plaintiffs in error.    With a single exception they are cases of public as distinguished from municipal corporations.    The distinction between the two classes of corporations is marked.    "The term municipal corporation has reference to incorporated villages, towns and cities, as distinguished from other public corporations, such as counties and quasi corporations: Dillon on Mun. Cor., § 10.    Municipal corporations are called into existence at the direct solicitation, or by the free consent of the persons composing them, for the promotion of their own local and private advantage and convenience.    On the other hand counties are at most but local organizations, which for the purposes of civil administration are invested with a few functions characteristic of corporate existence. They are local sub-divisions of a state, created by the sovereign power of the state, of its own sovereign will, without the particular solicitation, consent or concurrent action of the people who inhabit them.    The former (municipal) organization is asked for, or at least assented to, by the public it embraces; the latter organization (counties) is superimposed by a sovereign and paramount authority: Hamilton Co. v. Mighels, 7 Ohio 109.    A municipal corporation has for its object the interests, advantage and convenience of the locality and its people.    A county organization is intended to subserve the policy of the state at large in such matters as finance, education, provision for the poor, military organization, means of travel and transport, and especially the administration of justice. A municipal corporation is a government, possessing powers of legislation, and is charged with a general care for the welfare of the people; while a county organization is merely the involuntary agent of the state, charged with the interests of the state in the particular county, and clothed with certain administrative functions, limited in extent and clearly defined by law.    There is of course some analogy between the two classes of corporations.    They are parts of the same political system.    They differ in dignity and in power.    Each has such implied powers as are necessary for the execution of its powers expressly granted.    But it must be apparent that the implied powers of a municipal corporation are not to be measured by those of a mere public corporation, such as a parish, township or county.    There is little analogy between the powers of the councils of a great city, and those of the supervisors of a petty township, or the police jury of a parish.

Notwithstanding the narrow range of duties and limited powers of strictly public corporations, it is well known that in this state, at least, they have for a long time exercised the implied power of borrowing money.    In many counties it has been the practice for county commissioners to borrow money from banks and individuals,

giving therefor their promissory notes or other obligations. This has been done to meet unusual outlays, or to provide for a deficit in the treasury caused by an insufficient tax levy, or delay in collecting the taxes due. I am not aware of any considerable amount of abuse growing out of this system, while the public convenience of it in many instances is apparent. I express no opinion of the legality of such transactions. The question is not before us. I refer to it to show how deeply rooted in practice this principle has become in our political system.

We are not without authorities in favor of the power. In the case of the Bank of Chillicothe *v.* The Mayor of Chillicothe, 7 Hannum (Ohio) R. 354, the money was borrowed by the city from the bank to improve the streets of the town, and the power was held to be incident to the corporate authority. The case was decided upon the broad ground that if in effecting any of the legitimate objects of the corporation, such as regulating and paving the streets, and promoting the order and good government of the town, for which they were authorized to provide by ordinance, it became necessary to borrow money, the corporation might lawfully do it in the absence of express power in the charter, or of authorization by statute. So in Sturtevant *v.* The City of Alton, 3 McLean 393, it was held that a corporation having power to grade streets, &c., necessarily has power to make contracts respecting the same, and to issue bonds in payment therefor. To the same point is Mullarky *v.* Cedar Falls, 19 Iowa 21, in which it was decided that when the act of incorporation confers power upon the town to control its streets, and its duty is to improve them so as to afford a safe and easy transit, it may construct a bridge across a stream dividing a street, and issue its bonds to pay for the same. The City of Galena *v.* Corwith, 48 Ill. 423, so closely resembles the case at bar as to justify a more extended reference to it. There, as here, there was an express authority to borrow, and there was an issue of bonds in excess of the amount authorized. The charter of the city granted power to borrow so much money as the city might deem necessary, not exceeding $20,000 in any one year, and to issue bonds therefor. The bonds in suit were not issued by virtue of such power but in excess thereof. The city pleaded the general issue, want of consideration, and that the city had no authority to issue the bonds. There was a verdict for plaintiff in the court below, and a writ of error taken on the points raised by the pleadings. The judgment was affirmed, the court (Ch. J. Breese delivering the opinion) saying : " One single question will, we think, settle the present difficulty. The power in the charter to borrow money permits it to be expended in the useful and permanent improvement of the city. Now, suppose the whole amount is borrowed, and all expended in improvements, has the city no power to provide for its existing debt, which may be twice $20,000 ? * * * Every corporation or every natural

[City of Williamsport v. Commonwealth.]

person has the undeniable and inherent right to pay its debts or provide for their payment ; to fund them if that be deemed the best policy, and issue the necessary evidence thereof. It will not be denied municipal corporations have power to contract debts, and without limit unless restricted by their charters. Having this power, it follows they can provide for their payment, in such mode as they and the holders of the indebtedness may agree upon. * * * We believe it to be well settled doctrine, that corporations have all the powers of ordinary persons as respects their contracts, except when they are expressly, or by necessary implication, restricted, and that they have all the powers necessary to carry out expressly granted power. * * * The right bestowed by the charter to borrow by no means nullifies the power, vital to every corporation, to pay its debts or provide for their payment by postponing their payment to a future day, and issuing evidences thereof. We do not think the citation of any authority necessary to establish a proposition so plain. A city being in debt, which is evidenced by scrip or by promissory notes, may surely change the form of the indebtedness to interest bearing bonds, and this without any express authority in its charter. It is an inherent power and vital, without which such organizations could not live." In Mills v. Gleason, 11 Wis. 470, it was held that a municipal corporation has the implied power to borrow money for objects expressly authorized by its charter, as building markets, providing fire engines, &c. It is not obliged to wait until the money can be collected by taxation. Ketchum v. The City of Buffalo, 14 N. Y. 356, is also a case in point. There the city purchased ground for a market-house and gave its bond for the purchase-money ($35,000) payable to bearer, with interest semi-annually : the principal reimbursable in twenty-five years. Selden, J., puts the case upon the ground that the city having the right to purchase the real estate for the object for which it was acquired, had the right to do so upon credit, and to give its bonds in payment. See also, as sustaining the same doctrine, Kelly v. The Mayor of the City of Brooklyn, 4 Hill (N. Y.) 263 ; Clarke v. The School District, 3 R. I. 199 ; First Municipality of New Orleans v. McDonough, 2 Robinson 244; Clark v. City of Des Moines, 19 Iowa 199; and Adams v. The Railroad Company, 2 Caldwell (Tenn.) 645.

The foregoing cases rest upon the principle, which we think a sound one, that where a municipal corporation has lawfully contracted a debt, it has the implied power, unless restricted by its charter or prohibited by statute, to evidence the same by a bill, bond, note or other instrument; that the power to contract a debt carries with it by necessary implication the right to give an appropriate acknowledgment of such debt, and to agree with the creditor as to the time and mode of payment; that in the absence of any statutory provision there is no rule of law limiting the extent of the credit. This was evidently the view taken of this subject

by Mr. Justice STRONG, in Commonwealth *ex rel.* Rainboth *v.* The Councils of Pittsburgh, 5 Wright 284, where he says : " The power to execute and issue bonds, contracts or other certificates of indebtedness belongs to all corporations, public as well as private, and is inseparable from their existence. It is for this that they hold a common seal. No one would doubt that for a legal and authorized debt a municipal corporation might give its bond under its general corporate powers. If a bond given by such an obligor be void, it is not because of the form of the instrument, nor because general corporate powers do not warrant giving bonds, but because the debt for which the bond has been given was created without authority, against law or without law." Nor is this language of Mr. Justice STRONG mere dictum. The question of implied power was squarely before the court and directly decided in that case. The Act of Assembly conferred no express authority on the city of Pittsburgh to issue the bonds. It merely authorized it to subscribe to the stock of the Allegheny Valley Railroad Company. The very ground of the decision was that because the debt contracted by the city in its subscription to the stock was lawful, the implied power existed to issue bonds in payment. The city had no power to subscribe for the stock without legislative sanction, for the reason that building railroads, or aiding the construction thereof, was not among the objects of its creation. Hence it is that when a municipal corporation seeks to perform some act not in the line of its corporate duties, the power to do so must be the subject of express grant. But when such power is given, the grant thereof carries with it all the implied powers necessary to render it effective. The power of a municipal corporation to borrow money and issue bonds depends upon the fact whether the expenditure be for purposes authorized by its charter and made necessary and proper by its corporate duties. No one pretends that such corporations possess any implied power to borrow money to build a railroad, a steamship or an opera house.

Until quite recently, there was not a line in the charter of the city of Philadelphia, or in any Act of Assembly, authorizing the city to borrow money. No such power is contained in the charter of 1701, nor in the Act of 11th March 1789, incorporating the city. The Consolidation Act of 1854 recognises the power to borrow as pre-existing and regulates it, and authorizes the consolidation of the debt of the city and districts, to be thereafter known as " the debt of the city of Philadelphia." The Act of 27th March 1848, Pamph. L. 273, authorized the city to subscribe to the stock of the Pennsylvania Railroad Company and to issue bonds therefor. The passage of this act was doubtless owing to the fact that a doubt existed whether the charter of the company authorized subscriptions by municipal corporations. Eminent counsel differed in regard to it; the late Thomas I. Wharton having asserted in

[City of Williamsport v. Commonwealth.]

an elaborate opinion the right of the city to subscribe, while the late Chief Justice REED and Mr. Binney were equally positive on the other side. Their learned and able opinions are among the valuable contributions to our legal literature. The Act of 27th March 1848 was followed by similar acts in aid of the North Pennsylvania, the Hempfield, and the Sunbury and Erie Railroad companies. There may be other acts in furtherance of objects not in the line of the corporate duties of the city, but with these and perhaps some other trifling exceptions I know of no loan of the city of Philadelphia prior to the adoption of the present constitution, that rests upon any better foundation than the implied power of the city to borrow money. On the 29th of March 1799, an ordinance was passed by the city councils levying a tax to pay the interest upon a loan created to meet the expense of supplying the city with water. Edward Stiles, a taxpayer of the city, resisted the payment of his portion of the tax upon the ground of the illegality of the ordinance. This court by a unanimous decision held that the ordinance was valid and the tax properly levied : Stiles v. Jones, 3 Yeates 491. No opinion was delivered by the court, and the case is meagerly reported, yet it is undoubtedly a direct authority upon the point in controversy. It was so regarded by Mr. Binney and other eminent lawyers of that day. Upon the faith of it a large number of municipal bonds have been issued, many millions of dollars of which are now held by trustees and guardians as legal investments. To disturb the decision in Stiles v. Jones now would produce an amount of distress and ruin painful to contemplate.

If the power be a dangerous one it is a proper subject for legislative action. The legislature can abridge it for the future without disturbing the validity of past transactions. This is beyond the power of the judiciary. In fact the subject has already been disposed of by legislative action. The Act of 20th of April 1874, Pamph. L. 65, passed in pursuance of, and to give effect to section 8 of article 9 of the constitution, provides that any city, county, borough or school district, may incur debt, or increase its indebtedness to an amount in the aggregate not exceeding two per centum upon the assessed value of the taxable property thereof, and to issue coupon bonds therefor. In view of this express grant of power, the question under consideration is of little practical importance for the future.

The entire amount of bonds issued by the city of Williamsport (series A) was $645,000. The bonds were for $1000 each ; 239 of said bonds were issued to take up the prior indebtedness of the city ; 289 were issued on the Nicholson pavement contracts ; 22 on the Wykoff pavement contracts ; 42 for the purchase of engine house, lots and building engine houses ; 5 under contracts for grading ; 2 for building culverts ; and the remainder, 46, under contracts for the construction of drains and sewers. There is no

[City of Williamsport *v.* Commonwealth.]

substantial conflict as to the amount of bonds issued, the persons to whom, or the objects to which they were applied; of said bonds 200 ($200,000) were authorized by the act before referred to (21st March 1867). That to this extent they were issued for the prior indebtedness of the city is not material. By the arrangement with Mr. Herdic he was to take up the outstanding indebtedness of the city and receive the bonds in payment. This was the precise equivalent for money borrowed. That the debts of the city were bought at a discount does not in our judgment affect the validity of the bonds. The city owed the face of the warrants and is not injured by exchanging one form of indebtedness for another. The balance of said bonds depend for their validity upon the implied power of the city to issue them in payment or acknowledgment of its debts, lawfully contracted, in the furtherance of the objects for which the corporation was created. I have endeavored to show that such power exists. The expenditure may not have been wise, but it was lawful. This is the true test. In times of expansion corporations as well as individuals are liable to engage in projects disproportioned to their means. But neither corporations nor individuals can be allowed to repudiate a solemn obligation because it has been entered into unwisely or has become oppressive.

We cannot assent to the proposition that the implied authority of the city of Williamsport to issue bonds for municipal improvements was limited or taken away by the Act of 21st March 1867, authorizing the city to borrow $200,000. There is nothing upon the face of the act to indicate an intent to curtail the powers of the city. The object of said act was doubtless to enable the city to provide for its existing indebtedness, of which at the time a large amount was outstanding in the shape of dishonored warrants. We do not say that the act was necessary; it was doubtless considered so by those who procured its passage, the more so as it contained a provision authorizing the sale of the bonds at a discount of two per cent. per annum. We cannot assume in the absence of any such language in the act itself, that the legislature intended to take away by implication the right of the city of Williamsport, for all future time, to contract debts for municipal purposes. The limitation of the power to borrow money, if it be such limitation, does not affect the right of the city to grade and pave its streets, or perform any other necessary municipal duty. The contract with Mr. Herdic, so far as it related to these matters, was not a borrowing of money within the meaning of the Act of 1867. It was a contract to do certain work and to receive pay in city bonds. Contracting a debt is not borrowing money.

We do not think it necessary to discuss at length the question whether there was a legislative ratification of these bonds. We think they are valid without it. Yet if the case were doubtful it would not be without weight. The fact that a claim against a

[City of Williamsport v. Commonwealth.]

municipal corporation is not such as the law recognises as of legal obligation has been decided to form no constitutional objection to the validity of a law imposing a tax and directing its payment: Dillon, § 44, and authorities cited in note. The Act of 22d March 1870 recognises the debt of the city of Williamsport, designating it as series A. of bonds issued by the city, and requiring councils to levy a tax sufficient to pay the interest, while the Act of 26th of February 1873 provides that the coupons shall be receivable in payment of all taxes due said city. Then there is the Act of June 10th 1871, extending the provisions of the 14th section of the act entitled "An act relating to Orphans' Courts," approved March 29th 1832, to include the public debt of the city of Williamsport, thereby authorizing executors, administrators, guardians and trustees to invest the trust funds in their possession or under their control in the public debt of said city. These acts can hardly be held to apply only to so much of the debt as was authorized by the Act of 1867. The whole of the bonds comprised in series A. were issued by authority of the city, speaking through its mayor and councils, and formed a portion of the city debt. The legislature must have so understood it when they referred to the bonds as series A.

We do not think it necessary to pursue the subject further, nor to discuss any of the minor questions involved. Upon a careful consideration of the case, we see no reason to disturb the judgment of the court below. The city must pay "as it is nominated in the bond."

In affirming this judgment, we do not mean to deprive the city of any special defence to any particular bond or bonds in series A., and not embraced in this suit.

> The judgment is affirmed, and it is further ordered that the treasurer of the city of Williamsport do forthwith apply any money now in the treasury of said city, and not otherwise appropriated, to the payment of the accrued interest or coupons now overdue on said bonds, known as series A.

The following dissenting opinion was filed, October 4th 1877, by Agnew, C. J.—On leaving Harrisburg, where this cause was argued at the close of the session, I was under the belief that an instruction had been given to reverse the decree. Three of us were of that mind. No fault is found with the report of a contrary opinion; but it is a source of deep regret that this misunderstanding leaves now no opportunity in a two months session to examine and reply to an elaborate argument of twenty-six closely written pages. No option is left but to indicate in a general way the grounds of those who differ from it.

The leading doctrine of the opinion is dangerous in its character,

imperilling the interests of the inhabitants and taxpayers of all our cities, to an extent bounded only by the true character of those who administer their affairs. The recent and too lamentable history of corporations, public and private, teaches us how unreliable this dependence is. The doctrine of the opinion, reduced to a few words, is, that a power to make improvements and perform other duties, involving an expenditure of money, imports, by inference, and without special legislative consent, the power to issue and sell negotiable bonds in the market, without limit, except in the discretion of the city officials, and as a consequence at the market price which may be a discount on the face of the bonds. That no injustice may be done to the argument, I may state what the opinion fails to notice or distinguish, that of the bonds issued by the city of Williamsport, sixty-seven were for "unknown purposes," and one hundred and eighty-three were to "persons unknown," and for "purposes unknown" (vide Table D., p. 25, *et seq.*); that of six hundred and forty-five bonds issued, one hundred and forty were sold at sixty-three cents on the dollar, two at sixty-seven cents, and twenty at eighty-seven cents. These were all bonds of $1000 each. Also, that of the whole sum of $645,000, in bonds, $123,339 were not authorized by councils, and that one hundred and sixty-two one thousand-dollar bonds were issued to pay old debts and sold at a large discount. (Vide Statement C., pp. 23 and 24, and testimony of H. Mudge, Jr., p. 9.) In this connection it may be also stated that the old debts thus taken up were bought in by the party receiving the bonds at discounts varying from five to forty cents on the dollar. Of the $645,000 of debt thus incurred in negotiable bonds, but $200,000 were authorized by Act of Assembly. Finally, the ordinance of June 22d 1868, is an ordinance for the "*advance*" of money to pay old debts and make *future* improvements, and the ordinance of September 22d 1868, provides for issuing bonds in sums of $1000, payable to "bearer." Now the citizens of Williamsport find themselves involved in a debt of $645,000, none of which can be contested, when they find their way into the hands of bona fide holders for value, if the power to issue this amount be sustained, whether they be legitimate or illegitimate. Here it is the doctrine of the opinion does a great wrong. It sustains the illegitimate as well as the legitimate issues, on the ground that the implied power to issue them exists, and with this ægis covers the entire sum. The rightful and the wrongful rest upon the same basis of power, and the decree commands the city to raise the entire interest by taxation. No distinction is made and no remedy afforded to contest the wrongful. All these bonds are not invalid. Two hundred thousand were specially authorized by law, and others were probably given to honest contractors in payment of debts, and may be supported on the proper ground that bonds given for actual debts are binding. But the doctrine of the opinion goes far beyond this

[City of Williamsport *v.* Commonwealth.]

legitimate line of argument, and by a sweeping power derived from inference only, as a theory of municipal government, all are cast into the same pool to pay both honest contractors and gamblers in the city credit.

In substance, and when stripped of all verbiage and general statement, what is the argument which sustains this abuse ? That a power to make certain improvements and perform certain municipal duties, implies a power to contract and a duty to pay, and these again imply a power to give a suitable evidence of the debt, or the obligation to pay. To the extent of these powers and duties let the position be granted. This may be conceded to be a legitimate argument, when the instrument evidences an actual debt incurred in the execution of these powers, but it cannot be carried a step beyond without violating both law and logic, and endangering the safety of the people. That logic is false which deduces from the power of a mere municipal corporation to contract debts for improvements and the like, and give the contracter or the laborer an evidence of the debt due to him ; a power on part of such a corporation, created by law for governmental purposes, to issue commercial paper, be it bonds or notes, payable to the bearer, and negotiable according to the law merchant or general usage, and either to sell them in the market, or pass them off to individuals by way of a general loan. This power belongs to individuals and private corporations, whose directors are the agents of stockholders, but not to a mere municipality, unless specially authorized by law. If a city contracts with A. to lay a pavement or do other legitimate work, the contract or the work measures the payment to A., and fixes the liability of the city. To him, therefore, a bond or note or warrant may be given as the evidence of his debt, and so far an implied power to issue the paper may be urged. The same may be said of any other service or duty which a city is authorized to perform. So when a power to borrow money is conferred, the loan measures the sum, and the instrument evidences the debt thus incurred. But here again the city is protected by the actual contract of loan, and if the lender be guilty of usury by deducting a large discount, the city may defend. To this extent an inference from the power to borrow money may legitimate the instrument given as the evidence of the debt. But on what principle of logic or right reason, and on what ground of public security can it be inferred that a mere city government, for certain public purposes, can issue negotiable bonds, not to actual creditors, or for debts actually incurred and measured by the contract or the work done, but to be thrown upon the market or offered at private sale, in any amount the mere will of the councils may choose to resolve. This is not a municipal power. It flows from no relation of the citizens to the corporation. They are not stockholders, nor partners, nor associates, but are a portion of the people, living under a local government for

[City of Williamsport v. Commonwealth.]

certain local purposes. The officers of a municipal corporation are not the agents of the people. They are merely officers elected or appointed to perform certain municipal or local governmental duties defined by law in the charter or by those ordinances which the charter has authorized to be made. These duties cannot be extended by mere implication to grave and important acts not authorized by the law. Nothing but legislative grant can do this.

The labored argument to distinguish between cities and counties, evidences the strain upon the logic of the opinion. No difference exists to give color to an argument in support of an implied power, such as is inferred. Both are merely local governmental bodies to perform those local duties which the general legislative power cannot attend to. In nature they are the same, though differing in the extent and ends for which their powers are conferred. Neither can exercise a merely discretionary, or a merely commercial, or business power, not conferred by a legislative grant, for both are the mere creatures of the law, for government, and not for business purposes.

A power to issue at discretion an unlimited amount of commercial paper, not to actual creditors, but designed for the market, or for private investment, is not in its nature a municipal function or local governmental act, but is a mere business or commercial act, and if the councils can issue $645,000 or $445,000 beyond the legislative grant of power in this case, they can issue as many millions. They were not elected to exercise any such power; they do not represent the people for any such purpose, and they ought not to be intrusted with any such wild discretion.

Again, the doctrine of the opinion is contrary to the genius of the people and the spirit of their constitution. It was doubted at first whether even the legislature could constitutionally confer powers beyond those simply municipal, and when the case of Sharpless v. Philadelphia and kindred cases sustained the legislative power the people straightway interfered, and the series of amendments of 1857 curtailing this power was adopted. Since that time the people have again spoken in emphatic terms in the new constitution of 1873, further curtailing both legislative and municipal power. Yet this opinion by a stroke of the pen clothes the councils of cities with a sweeping authority drawn from inference and unlimited by law, by which the people of all our cities, great and small, are left at the mercy of ringsters, jobbers and plunderers. Will no example bid us shun this vortex of corruption? How long is it since this city of Pittsburgh, wherein we sit, has suffered losses by the issue and improper manipulation of its bonds of such magnitude its credit staggers under the load. What body, public or private, is safe from the machinations of dishonest men? It is but a few days since the city of Philadelphia has been thrown into wild consternation by a fraud of such dimen-

sions its business men scarcely know their condition or where to look for honest men.

Another fact is noticeable. Left without time for examination, I cannot state it as a known fact, yet from my general recollection of legislation, and the policy of the state, I believe it to be a fact that a power to borrow money by the issue and sale of negotiable bonds, payable to bearer, with or without coupons, has never been known to exist in any city except by special legislative grant. In the opinion, the example of the city of Philadelphia is referred to upon the power to borrow money, which, as I have shown, is measured and limited by the contract of loan, and therefore not within the case under discussion. If, however, there has been any departure in that city, I can only say that a calculation for the meridian of Philadelphia is wholly unsuited to the rest of the state.

Of course I cannot, in this hasty effort, examine the judicial decisions referred to, but I venture to assert that the real weight of judicial opinion is against the doctrine of such implied power, and that the cases cited in its support are chiefly those where the bonds or instruments in question were issued to actual creditors, or for debts actually contracted. Looking at the interests of the people and the genius of their institutions, ours should be the duty of restraining the capability of mere public servants to rob the people, instead of giving it wider scope for injury.

There is much more that ought to be said, and which might be better said than it can be in this work of a night. But, hasty as it is, I feel it an incumbent duty to put on record my dissent from a doctrine fraught with so much danger, resting on such slender grounds of implication, and opposed by so much respectable authority.

I hold, therefore, that a public corporate body, created by law for merely governmental purposes, has no implied power to issue negotiable bonds to raise money either in the open market or by sale to individuals for investment, at the mere will or discretion of the city councils, unauthorized by Act of Assembly, and unlimited in amount or in price. It is not a known municipal power, but one of the most dangerous kind, and I dissent, therefore, from a decree which places the bastard issues on the same plane of right as the issues for actual indebtedness for proper municipal purposes. The case before us calls for a just discrimination between them, and the decree should have been so framed.

In reply to the *addenda*, it may be said the Act of 20th May 1874 is foreign to the question here. It is not retrospective and does not help the unlawful issue of these bonds. As to the future, while it is a restraining statute when a city debt is sought to be increased, it justifies no implication of the prior existence of the power to issue and sell negotiable bonds either in open market, or

[City of Williamsport *v.* Commonwealth.]

to an individual for investment at sixty three, sixty-seven and eighty-five cents on the dollar.   On the contrary it is a legislative expression against the power.

Nor does the fact that the bonds, or rather the proceeds of them, may be applied to the various purposes stated in the conclusion of the opinion, justify the manner of issuing and selling them at the enormous discount shown by Table D.   The application of sixty-three dollars received on a bond, to a lawful debt, does not atone for creating a debt of $100.   It does not help the argument for an implied power to launch them out in the illegal manner stated; nor justify a sweeping decree to compel payment of the interest on the whole issue without discrimination.

Justices WOODWARD and STERRETT concurred in this dissenting opinion.

The plaintiffs in error subsequently applied to the court for a reargument, which application was refused by a majority of the court, AGNEW, C. J., and WOODWARD, J., dissenting.